## Commonwealth ex rel. Pogue v. Pogue

*Robert T. Potts*, for relator.

*Smillie, Bean & Scirica*, for respondent.

KNIGHT, P. J., June 25, 1954.—As of June term, 1950, no. 286, the court of quarter sessions of this

county imposed an order on Harrison S. Pogue to pay the sum of $26 per week toward the support and maintenance of his wife and two minor children.

As of February term, 1952, no. 122, a writ of habeas corpus was issued out of this court, on the petition of the father, the purpose of which was to seek temporary custody of the two minor boys, Ronald, the older, being then five, and Randall, the younger, being then almost three.

After a full hearing on March 10, 1952, the court, Judge Dannehower, made an order, part of which reads as follows:

"And now, March 10, 1952, the cause coming on for hearing, by agreement of counsel and the parties, the following consent decree is made:

"It is hereby ordered, adjudged and decreed that the minors, Ronald Pogue, age 5, and Randall Pogue, age 2, (almost 3) be committed to the permanent custody of their mother, Constance Pogue.

"Harrison S. Pogue, the father of said minors, shall have the right and privilege to the temporary custody of his minor sons every other weekend in the future, beginning on March 15, 1952, at 4 p.m., to the following day, Sunday, March 16, 1952, at 6 p.m., when he shall return said minor sons to their mother's home.

"In addition thereto, on alternate Sundays in the future, beginning on Sunday, March 23, 1952, he shall be permitted the custody of his minor sons from 1 p.m. to 6 p.m."

Again on October 24, 1952, the parties were in court on the complaint of the father that respondent was not complying with the order of March 10, 1952. After hearing before Judge Dannehower, the complaint was dismissed upon the promise of respondent to comply with the order of March 10, 1952.

On January 29, 1954, counsel for the father filed a petition on which an order was made commanding

the respondent to appear in court on February 5, 1954. The petition alleged that respondent had failed and refused to comply with the order of March 10, 1952.

Again a full hearing was had before Judge Dannehower, who, on March 9, 1954, entered the following order:

"On March 10, 1952, after a full hearing, two minor children, Ronald, age five (5), and Randall, age two (2), were committed to the permanent custody of their mother. The father was given the right to have the temporary custody of said minors every other week-end, from Saturday, March 15, 1952, at 4 o'clock p.m., until Sunday, March 16, 1952, at 6 o'clock p.m., when he must return said minors to their mother's home. On the alternate Sundays, beginning on Sunday, March 23, 1952, he was permitted custody of his two sons from 1 o'clock p.m. to 6 o'clock p.m.

"For some time, the father did not avail himself of the rights of visitation, because he had no place to take the children. He was remarried on May 31, 1953, and now lives on Pulaski Ave., Philadelphia, in a three-room apartment with his wife and one seven-year-old child and one six-month-old child. His father lived with him until after Christmas. On and after December 20, 1953, he was refused the right to take his children from their mother's home, but not the right to see them. Both sons have been quite ill since that time, according to Doctor Miraglia. They have had upper respiratory difficulties, tonsillitis, measles, tonsilectomies, cystitis and pneumonia. They will soon return to school and the father may resume his visitations as soon as they have sufficiently recovered from the measles.

"Counsel for the mother should notify counsel for the father when the visits may be resumed.

"The mother desired the hours and times of visitation changed, so that the children will not miss their

religious services on Sunday morning. The father desires no change. The only question before the hearing judge at this time is: Is the mother guilty of contempt of the court order concerning visitation. Under these circumstances, she is not guilty of contempt, and the rule must be discharged.

"If the times of visitation are not suitable for the children or the mother, a petition for a change may be filed to the Family Court.

"And now, March 9, 1954, for the foregoing reasons, the rule to show cause why the mother should not be adjudged in contempt is hereby discharged and petition is dismissed."

On March 18, 1954, respondent, Constance Pogue, presented a petition to this court, on which a rule was allowed to show cause why the order of March 10, 1952, should not be modified. On this rule a full hearing was held on March 31, 1954. At this hearing, both the father and mother were represented by different counsel than in the former proceedings.

The sole ground advanced for a modification of the order is that the order as it now stands interferes with the religious training and education of the children.

Matters of creed and religious faith are not for the courts, but when a petition for modification of a decree of this court is based entirely upon religious reasons, we must necessarily consider these reasons. The respondent, mother of the children, is a Roman Catholic, the father is a non-Catholic, although his religious affiliation is not shown. The parties were married in a Protestant church and their children were baptised in a Protestant church. For five years of their married life respondent did not attend her church. When the parties separated and the respondent took the children, she renewed her attendance at her church and had them baptised in a Catholic church. When the oldest

child became of school age respondent entered him in a parochial school without the consent and against the wishes of his father. When the father has custody of the children on Sunday, he takes them to a Protestant Sunday school and it seems that the only reason the mother wants the order modified is so the older boy may attend Catholic services on Sunday. The above are the admitted facts, although there is disputed evidence of certain prenuptial agreements between the mother and father as to the religious training of their children.

Although both parents deny making any disparaging remarks about the other's religious belief, there seems to be a good deal of bigotry on both sides. The father objects to his son making the sign of the cross, and the son has told his father that all Protestants are devils and are going to hell.

One thing is clear, that these unhappy differences of religion are not working for the best interest and permanent welfare of the children who are bound to be confused and emotionally upset. The mother and father are now divorced and the father has married again and now has a suitable home where he can take his children. He is supporting them, and has the right to have custody of them at reasonable times. The right of parents to exercise their discretion in providing for the spiritual need and religious training of their children is basic in our society. When parents entertain different religious views and are not willing to compromise their differences for the best interests of their children, then indeed an unhappy situation exists for the children. Such a situation confronts us in this case. The order of March 10, 1952, quoted above, awarded the permanent custody of infant relators to their mother, respondent. In our opinion, this gives to respondent a superior right over the father to direct the religious training of the children. Since the only

reason advanced for the modification of the order of March 10, 1952, is that the order interferes with the attendance of Ronald at Catholic services on Sunday morning, we will change the time when the father may have custody of infant relators over night from Friday night to Saturday night.

When William Penn established his colony in Pennsylvania, he offered to all those who came religious liberty. The people of Europe took him at his word and here came those from many lands persecuted for their religious beliefs. That is the reason, perhaps, that we have so many different creeds, religions and sects in southeastern Pennsylvania. Here they came and here, working side by side in harmony, they built up a civilization and a way of life which we believe is unsurpassed in the world today. May we suggest to this mother and father and their respective families that instead of instilling prejudice and hatred in the minds of these little boys, that they teach them that tolerance for the opinions and that respect for the belief of others so necessary if we are to continue to enjoy the blessings of liberty.

Three times the father has summoned this mother into court, complaining that she has violated the order of March 10, 1952. She declares that she has obeyed the order to the letter, but her conduct has been such as to cast a serious doubt on her declaration and her good faith in the matter. We want this respondent to understand that the order of this court must be obeyed unless some real and compelling reason justified her in refusing the father the limited custody of his children, provided for in this modified order.

And now, June 25, 1954, the order entered in this case on March 10, 1952, is modified to read:

"It is ordered, adjudged and decreed, that the minors, Ronald Pogue, now age seven (7), and Randall Pogue, now age four (4), be committed to the permanent custody of their mother, Constance Pogue.

"Harrison S. Pogue, the father of said minors, shall have the right and privilege to the temporary custody of his minor sons every other week end in the future, beginning on Friday, July 2, 1954, at 4 o'clock p.m., to the following day, Saturday, at 6 o'clock p.m., when he shall return said minor sons to their mother's home. In addition, on alternate Sundays in the future, beginning Sunday, July 11, 1954, he shall be permitted the custody of his minor sons from 1 o'clock p.m. to 6 o'clock p.m.

"In the event the parents or their counsel cannot agree on limited custody for the father for a short period during the summer months or on holidays, the matter may be again submitted to the court."